UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 6:17-CR-051-CHB |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION AND** |
| RICHARD J. HODGE, JR., ) | **ORDER GRANTING EMERGENCY** |
| ) | **MOTION FOR COMPASSIONATE** |
| Defendant. ) | **RELEASE** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Richard J. Hodge, Jr.'s Emergency Motion for Compassionate Release. [R. 360]. The United States responded in opposition [R. 364], and Defendant replied [R. 366]. For the reasons stated herein, Defendant's Motion is **GRANTED**.

### I.   Background

On November 27, 2017, Defendant Richard Hodge, Jr. was arrested in connection with the charges contained in the Second Superseding Indictment and has remained in continuous custody since. [Pre-Sentence Report (PSR), ¶ 1]. He pleaded guilty on November 13, 2018 to conspiracy to distribute between 200 and 350 grams of a mixture or substance containing methamphetamine. [R. 221; R. 222] He was sentenced to 98 months incarceration followed by a four-year term of supervised release. [R. 270 (Judgment)] Mr. Hodge is housed at Federal Correctional Institute Butner Medium II (FCI Butner). His projected release date is November 11, 2024. *Inmate Locator*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Mar. 23, 2021). On February 3, 2021, Defendant moved for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), known as a "compassionate release," in light of the COVID-19 pandemic. [R. 360]

## II.  Legal Standard

The compassionate-release statute allows the Court to reduce the term of imprisonment and impose a term of probation or supervised release under certain narrow circumstances. Section 3582(c) provides that:

> The court ***may not*** modify a term of imprisonment once it has been imposed ***except that***—
>
>> (1) In any case—
>>
>>> (A)  ***the court***, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, ***may reduce the term of imprisonment*** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), ***after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that***—
>>>
>>>> *(i)  extraordinary and compelling reasons warrant such a reduction . . .*
>>>>
>>>> ***and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.***

18 U.S.C. § 3582(c)(1)(A) (emphasis added). Prior to the First Step Act of 2018 (FSA), Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), only the director of the Bureau of Prisons (BOP) could move for a sentence reduction under section 3582(c). 18 U.S.C. § 3582(c)(1)(A) (2017); *United States v. Jones,* 980 F.3d 1098, 1104 (6th Cir. 2020). However, under the FSA, courts may now consider motions by defendants so long as the defendant satisfied the statute's exhaustion requirement—that is, "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Exhaustion by one of the two means listed is a "mandatory condition" to the Court granting compassionate release. *United States v. Alam*, 960

F.3d 831, 833−35 (6th Cir. 2020). If the government "properly invoke[s]" the condition, the Court must enforce it. *Id.* at 834.

Upon satisfying the exhaustion requirement (or upon waiver by the government of this requirement), the statute requires the Court to undertake a three-step test in reviewing compassionate-release motions. *Jones*, 980 F.3d at 1107–08. At step one, the Court must "find" whether "extraordinary and compelling reasons" warrant a sentence reduction. *Id.*; 18 U.S.C. § 3582(c)(1)(A)(i). At step two, the Court must "find" whether a reduction in the sentence is "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* at 1108; 18 U.S.C. § 3582(c)(1)(A)(i). At step three, the Court must "consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." *Jones*, 980 F.3d at 1108 (quoting *Dillon v. United States*, 560 U.S. 817, 827 (2010)). In reference to step two, the Sentencing Commission in 2006 issued its policy statement in § 1B1.13 of the United States Sentencing Guidelines and the application notes to that section. *See* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13 (2006). However, because this policy statement has not been updated since passage of the First Step Act in December 2018, the Sixth Circuit recently held that § 1B1.13 is inapplicable to compassionate-release motions filed by the prisoner (as opposed to motions filed by the Director of the Bureau of Prisons). *Jones*, 980 F.3d at 1109–11; *see also United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021). Consequently, in cases like this one, where the defendant files a motion for compassionate release, "federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Jones*, 980 F.3d at 1111. Further, "district courts may deny compassionate-release motions when any of the three prerequisites listed in §

3582(c)(1)(A) is lacking and do not need to address the others." *Elias*, 984 F.3d at 519. Of course, when granting a compassionate-release motion, the district court must address all three steps in its analysis. *Id.* The defendant bears the burden of establishing a sentence reduction is warranted. *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

With these standards in mind, the Court will now turn to the substance of Defendant's Motion.

### III.  Discussion

As an initial matter, the Court will first address whether Defendant has satisfied the administrative exhaustion requirement. *Alam*, 960 F.3d at 833−35. The United States does not contest exhaustion, and Defendant provides proof that on July 6, 2020 he requested compassionate release from the warden at FCI Butner, and the request was denied (as was his appeal). [R. 360-2; R. 360-3; R. 360-4] Because more than thirty days have passed since Mr. Hodge made his request to the warden, the Motion is properly before the Court. *Alam*, 960 F.3d at 833−35.

   A. **Extraordinary and Compelling Reasons**

The Court next considers whether the Defendant meets the substantive requirements for compassionate release as outlined by the Sixth Circuit in *Jones*. At step one, the Court must find that "extraordinary and compelling reasons" warrant a sentence reduction. § 3582(c)(1)(A)(i); *Jones*, 980 F.3d at 1107–08. The statute does not define "extraordinary and compelling" and, as mentioned above, the *Jones* Court recently held that the Sentencing Commission's policy statement in U.S.S.G. §1B1.13 is inapplicable. *Jones*, 980 F.3d at 1111. Consequently, until the Sentencing Commission updates § 1B1.13 post–First Step Act, "district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies

compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." *Id.* at 1110. This Court has focused on an inmate's health vulnerabilities to COVID-19 along with the particular BOP facility's ability to contain the virus in determining whether extraordinary and compelling reasons exist for compassionate release. *See United States v. Herring*, No. 6:14-cr-008-GFVT, 2020 WL 6886256, at *4–5 (E.D. Ky. November 24, 2020); *United States v. Patrick*, No. 6:17-CR-038-REW, 2021 WL 164554, at *2 (E.D. Ky. Jan. 19, 2021); *United States v. Sallee*, No. 6:18-cr-27 (E.D. Ky. Feb. 11, 2021), ECF No. 61, at *9–10; *see also Elias*, 984 F.3d at 520 (affirming a district court's use of a similar two-part test in determining whether extraordinary and compelling reasons justify compassionate release). The Court will likewise examine these two considerations, along with other relevant considerations.

In his Motion, Defendant explains that he suffers from numerous, significant medical conditions that place him among the most vulnerable to COVID infection in the entire BOP system. The United States does not contest the well-documented medical evidence provided by Defendant in support of his Motion, and the Pre-Sentence Report (PSR) substantiates his significant medical history. [PSR, ¶¶ 98–100] The most current Centers for Disease Control (CDC) guidance identifies twelve medical conditions that, any one of which, place an individual at increased risk of severe illness from COVID—the CDC's highest risk category. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Mar. 25, 2021). Mr. Hodge suffers from *four* of these medical conditions: chronic kidney disease [R. 360, pp. 6, 11; R. 360-5, pp. 2–3; R. 360-10, p. 2]; heart disease/failure [R. 360, pp. 6, 11; R. 360-8, p. 3; R. 360-9, p. 3]; immunocompromised state due to solid organ transplant [R. 360, p. 11; R. 360-5]; and obesity with a body mass index (BMI) of 35.1. [R. 360, p. 7; R. 360-5, p. 2; R. 360-11, p. 3] Any *one* of

these conditions would place him in the highest risk category defined by the CDC, and he suffers from four. He also has hypertension, which places him at increased risk from COVID. [R. 360, p. 12]

Specifically, Mr. Hodge suffers from end-stage liver and kidney disease that resulted in a double liver-kidney transplant in October 2013. [R. 360-4] As a result he takes two immunosuppressants which place him at higher risk of severe illness from COVID. [R. 360-5; R. 360-6] Mr. Hodge has a history of heart disease and has two stents in his heart. [R. 360, p. 6; R. 360-8, p. 3; R. 360-9, p. 3] He takes three different prescriptions to control his heart disease. [R. 360-7, p. 2] Mr. Hodge has stage III chronic kidney disease and takes two medications to manage this condition. [R. 360, p. 6; R. 360-5, pp. 2–3; R. 360-10, p. 2] He has hypertension and takes medicine to control the condition. [R. 360, p. 7; R. 360- 5, p. 2; R. 360-10, p. 2] Mr. Hodge is also morbidly obese with a BMI of 35.1. [R. 360, p. 7; R. 360-5, p. 2; R. 360-11, p. 3]

Further, Mr. Hodge recently contracted COVID and suffered significant symptoms including his lungs feeling as if they were "on fire" and vomiting and diarrhea for 9 days. [R. 360, pp. 7–8] He argues that the medical personnel at FCI Butner failed to adequately treat and monitor him, failed to provide care and record his symptoms and oxygen levels, and failed to ensure his other medical conditions were properly treated while he battled COVID. *Id.* Indeed, after Mr. Hodge's diagnosis, his medical provider at FCI Butner noted in his chart, "Due to the sheer volume of inmates positive with covid-19, daily vital signs and [Bureau Electronic Medical Records(BEMR)] covid screenings are no longer recommended." [R. 360, p. 7; R. 360-16, p. 2] Defendant argues that his health conditions place him at heightened risk for serious complications or death from COVID-19 should he become reinfected with the virus due to his already-compromised immune system. [R. 360, pp. 11–13] This concern is amplified given the

emergence of new (more virulent and contagious) mutations. *See infra* pp. 7–8. He argues that the conditions of confinement exacerbate the spread of the virus and pose even more threats to people like him with seriously compromised immune systems, especially where the BOP has already demonstrated "it is unable to protect Mr. Hodge from becoming infected again." [R. 360, p. 15] Mr. Hodge cites to recent scientific and medical studies and literature in support of his arguments concerning his medical vulnerabilities. [R. 360; R. 366]

Turning to FCI Butner's response to the COVID-19 pandemic, it is clear the facility has struggled to contain the virus. Certainly it is understandable that the dangers of coronavirus are exacerbated by the prison environment, even when significant measures are undertaken to prevent its spread. *See United States v. Atwi*, 455 F.Supp.3d 426, 430 (E.D. Mich. April 20, 2020). FCI Butner, where Mr. Hodge is housed, has been hit hard by COVID. FCI Butner Medium II has 435 inmates who have previously been infected with the virus and 3 deaths. *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Mar. 23, 2021). With a total inmate population of 1,415, about 31% of the total population has contracted the virus at some point. *FCI Butner Medium II*, Bureau of Prisons, https://www.bop.gov/locations/institutions/btf/ (last visited Mar. 23, 2021). Six inmates and three prison staff have active COVID infections. *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Mar. 23, 2021). The statistics certainly demonstrate that Mr. Hodge's fears of reinfection given his comorbidities, previous infection, systemic immunocompromised conditions, and the surging mutations are legitimate.

Even before COVID-19 mutations started appearing, the evidence was unclear on the risks of reinfection. *See United States v. Coates*, No. 13-CR-20303, 2020 WL 7640058, at *7 (E.D. Mich. Dec. 23, 2020) (collecting studies that showed growing risks of COVID reinfection,

sometimes with more severe symptoms than original infection); *United States v. Keys*, No. 2:16-CR-00234-KJM, 2020 WL 6700412, at *4 (E.D. Cal. Nov. 13, 2020); Marilynn Marchione, *Coronavirus Variants: Experts Fear Mutations Could Mean COVID-19 Reinfections*, FOX 5 Atlanta (Feb. 8, 2021), https://www.fox5atlanta.com/news/coronavirus-variants-experts-fear-mutations-could-mean-covid-19-reinfections (describing a study that found that 10% of Marine recruits with past COVID infections appeared to suffer COVID reinfection). And the rapid transmission of COVID-19 mutations throughout the United States and the world has only heightened the risk of reinfection. Marchione, *supra*; Carolyn Y. Johnson & William Wan, *Mutated Virus May Reinfect People Already Stricken Once with COVID-19, Sparking Debate and Concerns*, Wash. Post (Feb. 5, 2021, 7:33 PM), https://www.washingtonpost.com/health/2021/02/05/virus-variant-reinfection-south-africa/ ("The level of immunity that you get from natural infection . . . is obviously not enough to protect against infection with the mutant." (quoting Dr. Anthony Fauci)). As if the pandemic could not get worse, recent mutations of the virus appear more contagious. Robert Bollinger & Stuart Ray, *New Variants of Coronavirus: What You Should Know*, Johns Hopkins Med. (Jan. 29, 2021), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/a-new-strain-of-coronavirus-what-you-should-know; Karen Weintraub & Elizabeth Weise, *New Strains of COVID Swiftly Moving Through the US Need Careful Watch, Scientists Say* (Jan. 22, 2021, 10:33 AM), https://www.usatoday.com/story/news/health/2021/01/22/covid-new-virus-mutations-but-vaccines-fight-outbreak/4216815001/. Nothing in FCI Butner's handling of the pandemic brings the Court comfort or proof that they will fare any better at preventing reinfection, especially for a prisoner such as Mr. Hodge with a severely compromised immune system.

The United States agrees that Mr. Hodge "suffers from numerous health conditions that place him in a higher risk range if he were to contract COVID-19" and concedes that Mr. Hodge presents "extraordinary and compelling reasons" for release under step one of the *Jones* analysis. [R. 364, p. 2] Otherwise, the United States wholly fails to address FCI Butner's response to the pandemic or its treatment of Mr. Hodge (or apparent lack thereof) while infected with COVID. The government instead argues that Mr. Hodge fails under the § 3553(a) balancing.

Based on Mr. Hodge's numerous and significant comorbidities (four of which place him in the CDC's highest risk category), the infection prevalence at FCI Butner (and their apparent resulting inability to care for him during his first bout with COVID), his age, and the emergence of new and more contagious mutations of the virus, Mr. Hodge easily presents an extraordinary and compelling case for release, as the government acknowledges.

### B. Balancing Under § 3553(a)

Even though Mr. Hodge's health conditions satisfy step one of the *Jones* inquiry as extraordinary and compelling, release is warranted only if it is consistent with the sentencing factors set out in 18 U.S.C. § 3553(a), which include in part: the nature and circumstances of the offense; the Defendant's history and characteristics; and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public from further crimes, and avoid unwarranted sentencing disparities. § 3553(a)(1)–(7); *see also Jones*, 980 F.3d at 1112–16 (discussing the district court's obligation to weigh the § 3553(a) factors and to provide specific factual reasons for its decision that furnish a thorough factual record for review). This Court need not "specifically articulat[e]" every single § 3553(a) factor as part of its analysis. *Jones*, 980 F.3d at 1114. Rather, the record "as a whole" (the original sentencing proceeding and the modification proceeding) must confirm the district

court considered the "pertinent" factors. *Id.* at 1115. This Court has thoroughly reviewed the sentencing proceedings in this case, along with the parties' arguments and submissions related to the current Motion and is convinced that release is warranted under the statutory factors.

Mr. Hodge urges that the 3553(a) factors compel release. First, his history and characteristics demonstrate that he is at the highest risk for severe COVID consequences given his *four* comorbidities which place him in the CDC's highest risk category. Despite these comorbidities, Mr. Hodge not only contracted COVID while at FCI Butner, but, by its own admission in his medical records, the prison was so overwhelmed by the volume of COVID-positive inmates, ("*[d]ue to the sheer volume of inmates positive with covid-19, daily vital signs and BEMR covid-19 screenings are no longer recommended*" [R. 360-16, p. 2 (emphasis added)]), it dispensed with the simple task of recording daily vital signs, even for prisoners as medically vulnerable as Mr. Hodge. [R. 360-16, p.2; R. 360, pp. 7–10] Mr. Hodge urges that "[t]he BOP's failure to protect and adequately treat Mr. Hodge warrants a reconsideration of his sentence." [R. 360, p. 14 (citing *United States v. Vazquez-Torres*, No. 19-cr-20342-BLOOM, 2020 WL 4019038, at *4 (S.D. Fla. Jul. 14, 2020))]

Mr. Hodge next argues that although he was sentenced as a career offender, he has no history of violence—as both predicate convictions for his career offender status are nonviolent drug offenses (one for possessing 514 Sudafed tablets)—and his history shows no predilection toward violence. [R. 360, p. 16] Mr. Hodge notes that he has been an exemplary inmate with no infractions, maintains a job as a cook, and has completed numerous education courses including financial literacy, hobby craft, and managing drug abuse. [R. 360, p. 8] He also advises that he has "been hoping to participate in the RDAP program." *Id.* All of this, he urges, demonstrates he "is working towards improving his life and is capable of respecting the law and becoming a

- 10 -

productive member of society." *Id.* at 16. He argues that given all this, along with his age and severely compromised health conditions, he poses no danger to the community, and that any perceived danger can be addressed by "whatever conditions [the Court] believes are necessary." *Id.* at 16–17.

Mr. Hodge acknowledges the severity of his crime, conspiring to distribute a substance containing methamphetamine, but notes his role in the conspiracy involved a simple, nonviolent drug offense. *Id.* at 18. While acknowledging his sentence was supported at the time, the circumstances of his confinement have wholly changed, given the service of his sentence during a life-threatening pandemic, made more challenging because of his numerous health conditions. *Id.* at 19.

He argues that a sentence of time served (with whatever conditions deemed appropriate upon release) will reflect the seriousness of his offense since he will have served approximately 40 months in custody under the most challenging conditions. *Id.* at 19–20. He further notes that his Guideline range would have been considerably less from the get go but for being sentenced as a career offender based on nonviolent drug convictions. *Id.* Finally, he points the Court to numerous cases where courts have granted compassionate release to career offenders, some of which, unlike Mr. Hodge, have criminal histories that include crimes of violence. *Id.* at 20 (citing cases). He contends that release at this point would afford adequate deterrence—since he served nearly 40 months in prison, which is the longest sentence he has ever served in custody—and is appropriate for nonviolent defendants who earn a downward departure, like himself. *Id.* at 21.

Finally, Mr. Hodge argues a sentence of time served is sufficient to protect the public given his age and significant medical conditions, and release is necessary to allow him to obtain appropriate medical care. *Id.* at 22. Once again, he notes the BOP's inability to protect him from

the virus and to care for him, and he expresses concern for the BOP's ability to further protect him from reinfection or the lasting effects of COVID-19, especially given his long-standing and serious medical conditions. *Id.*

The United States offers a scant few paragraphs for its § 3553(a) arguments, failing to address all the relevant factors other than reiterating Mr. Hodge's criminal history and arguing this alone justifies denial of his Motion. [R. 364, pp. 3–4] First, it is not clear what is meant by the government when it states Mr. Hodge was "sentenced to a mandatory minimum term of imprisonment of 98 months." *Id.* at 3. The only mandatory minimum sentence applicable to Mr. Hodge was 60 months, and he was sentenced above the statutory mandatory minimum. The government notes the drug quantity attributable to Mr. Hodge, recounts his criminal history between 2004–2011, and mentions his violations in the past while on supervision or parole, which make him a danger to the community. [R. 364, p. 4] The government contends release at this point, having served only a portion of his sentence, would not serve the punitive aspects of sentencing.

In his reply, Mr. Hodge points out that the government presents no qualitative analysis of his criminal history and four of his convictions are so unremarkable that they contain no description. [R. 366, p. 3] The rest he argues, while not laudable, involve nonviolent drug offenses, including possession of Sudafed tablets. Otherwise, Defendant's reply points out the government's failure to address in any meaningful way the balance of his arguments under the statutory factors.

The Court has considered the arguments made by the parties, as well as the sentencing record in this case and other relevant materials. First, the "nature and circumstances of the offense and the history and characteristics of the defendant," counsel in favor of release (or

certainly do not preclude it). To be sure, the gravity of Defendant's crime is not in question. He conspired with others to distribute methamphetamine, one of the most dangerous drugs. The Court agrees with the government that the nature and circumstances of this offense are concerning, as is Mr. Hodge's criminal history. But Mr. Hodge's role in the conspiracy was a low-level drug distributor and involved no violence. Indeed, his criminal history contains no crimes of violence and is relatively dated, with the last conviction in 2011. He qualified as a career offender in this case based on nonviolent drug convictions. *See* U.S. Sentencing Comm'n, *Report to Congress: Career Offender Sentencing Enhancements* 15, https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf (recommending the career offender directive be amended to differentiate between those qualifying based on a crime of violence and those qualifying based on a drug trafficking offense).

The Court has seriously considered the government's passing argument that Mr. Hodge has failed on supervision in the past. However, the Court agrees that Mr. Hodge's efforts toward rehabilitation while incarcerated demonstrate a commitment to change and support release. He has an exemplary record at FCI Butner with no infractions, has worked consistently, and completed a number of courses (including drug treatment) to better prepare him for successful reentry upon release. Mr. Hodge has a firm reentry plan upon release—to return to his old home in East Bernstadt, Kentucky where he can better shield from the virus and have access to better medical treatment.[1] The Court will also impose an additional mechanism to prevent recidivism, as Mr. Hodge will be confined to his home and under the close supervision of the United States Probation Office, and will also be subject to drug treatment, drug testing, and periodic searches

---

[1] Mr. Hodge originally indicated he would relocate with his family to North Carolina, but per information recently provided to the Probation Office, he will return to the family home in Kentucky. [R. 360, p. 10]

of his vehicle, residence, and person. Further, Mr. Hodge's significant medical issues are part of his history and characteristics and, along with his rehabilitative efforts and monitoring by Probation, persuade the Court that he will not be a danger to society upon release.

Mr. Hodge does not dispute the gravity of his offense or the appropriateness of his sentence when imposed. Rather, he persuasively argues that serving over three years of his sentence, with the last one under extreme conditions of confinement due to COVID, would constitute just punishment and not detract from the seriousness of his offense. The Court agrees. Mr. Hodge is immunocompromised, obese, and a double transplant recipient with a history of heart disease, chronic kidney and liver disease, and hypertension. He is certainly among the most vulnerable to COVID within the entire BOP system. Nevertheless, he contracted COVID and his care was severely compromised while the facility was overwhelmed with prisoner infections. The Court has grave concerns about the BOP's ability going forward to prevent reinfection or to address additional health risks stemming from his previous COVID infection. *See Long-Term Effects of COVID-19*, CDC (Nov. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html. Upon release as ordered below, Mr. Hodge will have served approximately 48% of his sentence—that is, he will have served 40 months out of a total sentence of incarceration of 83 months (which includes credit for good time per the BOP calculation). He has served much of his last year under conditions of lockdown due to COVID-19 while also dealing with his significant medical conditions and recent battle with COVID. The Court has seriously weighed the government's undeveloped argument that release after serving only a portion of his sentence fails to honor the punitive aspects of the sentencing factors. But Mr. Hodge is not getting a get-out-of-jail-free card. Rather, he will serve a significant period of time under strict

conditions of home incarceration—a serious and significant restraint on his liberty. Further, he will be monitored by the U.S. Probation Office.

This Court does not have the statutory authority to modify a defendant's current sentence to home confinement. *See United States v. Townsend*, 631 F. App'x 373, 378 (6th Cir. 2015) (explaining that the authority to determine the place of a prisoner's confinement is delegated solely to the Bureau of Prisons); *United States v. Jalili*, 925 F.2d 889, 894 (6th Cir. 1991) (same); *Coates*, 2020 WL 7640058, at *11. However, courts may reduce a defendant's current sentence to time served and impose a new term of supervised release and/or home confinement. *See United States v. Amarrah*, 458 F. Supp. 3d 611, 620 (E.D. Mich. 2020) (reducing sentence to time served and imposing a new term of supervised release, with the first 12 months of the release to be served in home confinement); *United States v. Anderson*, No. 3:98-CR-00038, 2020 WL 6119923, at *7 (M.D. Tenn. Oct. 16, 2020) (same, with a special term of six months of home confinement); *United States v. Brownlee*, No. 14-20562, 2020 WL 6118549, at *6 (E.D. Mich. Oct. 16, 2020) (same, with a special term of 18 months of home confinement). This Court will therefore follow suit and reduce Mr. Hodge's sentence to time served and impose a special term of supervised release with home incarceration until November 11, 2024 (which covers the term of his original sentence of incarceration), to be followed by four years of his previously ordered supervised release.

Home incarceration, coupled with the sentence already served under extreme conditions, will ensure the twin goals of just punishment and respect for the law are honored. Likewise, the Court has considered the other § 3553(a) factors, including the kinds of sentences available, any applicable policy statements, the need to avoid *unwarranted* sentencing disparities, and the need to provide restitution. *See* § 3553(a). None of these factors precludes release. Because Mr. Hodge

has served approximately 48% of his sentence and because he faces a unique risk of death given his four comorbidities listed by the CDC as posing the highest risk of severe consequences from COVID, no unwarranted disparity will result. After weighing all the § 3553(a) factors and given the unique and grave risk posed by his previous COVID infection and COVID-19 reinfection to Mr. Hodge, the inability of FCI Butner to contain the virus (or apparently provide for his care), his nonviolent criminal history, his extensive rehabilitative efforts and lack of disciplinary infractions while in custody, and the fact that he will serve a significant period in home incarceration, release is warranted.

In summary, neither Mr. Hodge's history and characteristics, nor the considerations regarding the need for the sentence imposed, warrant keeping him in federal custody while he suffers from *four* comorbidities listed by the CDC as posing the highest risk of severe consequences (or death) from COVID—chronic kidney disease, heart disease/failure, immunocompromised state due to solid organ transplant (liver and kidney), and obesity. This, while he *also* battled COVID and the BOP was apparently ill equipped to provide for his care. Releasing Mr. Hodge to strict home confinement allows him to continue to repay his debt to society, serves as adequate punishment, and reflects respect for the law, while also allowing him to seek medical care for his complex medical issues. *See Vazquez-Torres*, 2020 WL 4019038, at *4; *United States v. Williams,* No, 3:04-cr-95-MCR, 2020 WL 1751545, at *4 (N.D. Fla. Apr. 1, 2020). Requiring Mr. Hodge to continue to serve his sentence in custody while gravely ill and with the risk of inadequate medical care "means that his sentence [would be] significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary" to serve the purposes of punishment set for set forth

in § 3553(a)(2). *Vazquez-Torres*, 2020 WL 4019038, at *4 (citations and internal quotations omitted).

Mr. Hodge will be 52 years old upon release and he suffers from numerous life-threatening conditions. He is being given a unique opportunity to manage these health conditions outside the prison environment and to have another chance at becoming a productive member of society and positive influence on his family. Mr. Hodge reportedly lived sober for several years (around 2011 till 2017) before relapsing in this case. [PSR, ¶ 102] No doubt he understands that continued sobriety will be the key not only to his success during home confinement and supervised release, but also to maintaining what health he has left.

For these reasons, this Court will exercise its considerable discretion and grant release under the conditions outlined below.

Accordingly, the Court being sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Defendant's Motion for Compassionate Release [**R. 360**] is **GRANTED**.

2. Defendant Richard J. Hodge Jr.'s sentence of incarceration is hereby **REDUCED to TIME SERVED effective March 29, 2021 at 2:00 PM (EDT).**

3. The Bureau of Prisons shall release Defendant on **March 29, 2021 at 2:00 PM (EDT), or as close as possible to that time.**

4. The Court will impose a **special term** of supervised release under 18 U.S.C. § 3582(c)(1) that will begin immediately upon Defendant's release from custody. Defendant shall be subject to **home incarceration** (with voice recognition monitoring) at the address in East Bernstadt, Kentucky provided to the U.S. Probation Office until **November 11, 2024**, at which time the special term of supervised release will expire. During that period of home incarceration,

**Defendant shall not leave that residence** other than for employment, job training, religious services, medical and/or mental health appointments, treatment programs, appointments with counsel, and/or other activities approved in advance by his supervising probation officer. During the special term of supervised release, Defendant is also subject to the same conditions of supervised release originally imposed in the original Judgment. Defendant shall pay for the cost of voice recognition monitoring to the extent he is able to do so, as determined by the U.S. Probation Office.

     5.     Upon returning to his home in East Bernstadt, Mr. Hodge **shall self-quarantine at his residence for fourteen (14) days, except for necessary medical treatment and upon prior notice and approval by U.S. Probation (except in the case of a true medical emergency, in which case prior approval is not necessary)**.

     6.     Upon expiration of the special term of supervised release, Defendant shall begin serving the four-year term of supervised release that the Court imposed in the Judgment. To be clear, this four-year term of supervised release is to run entirely consecutively to the special term of supervised release discussed above. The Court will enter an amended judgment and commitment.

This the 26th day of March 2021.

*[Signature]*
CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY

cc:    Counsel
       U.S. Probation Office, Eastern District of Kentucky
       U.S. Marshal
       Bureau of Prisons